J-S17003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 452 EDA 2022 |

Appeal from the Order Entered January 26, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0002974-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 453 EDA 2022 |

Appeal from the Decree Entered January 26, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000489-2017

BEFORE: BOWES, J., LAZARUS, J., and STABILE, J.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 26, 2022**

Appellant, A.W. ("Father"), files these consolidated appeals from the decree dated and entered January 26, 2022, in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights to his son, L.B. ("Child"), born in October 2014, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father further appeals from

the order dated and entered January 26, 2022, changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1] After review, we affirm.

Child became known to DHS in 2015 due to a General Protective Services ("GPS") report related to Mother's mental health and substance abuse. N.T., 1/26/22, at 8. At the time, Father's identity was unknown. *Id.* Subsequent to an Order of Protective Custody ("OPC") dated November 13, 2015, and confirmed by a shelter care order dated November 16, 2015, Child was removed from Mother and committed to DHS. *Id.* at 9. The trial court then adjudicated Child dependent on November 24, 2015. Child has remained placed and in DHS custody since then. *Id.*

The record reveals that Father's identity became known in approximately May 2016. *See* Permanency Review Order, 5/18/16. Following parent locator searches, Father appeared at a dependency hearing on May 2, 2017. *See* Permanency Review Orders, 5/2/17, 2/17/17, 11/15/16, and 5/18/16. While someone else was previously identified as Child's biological father, in May 2017, the court ordered a paternity test which established Father's paternity. N.T., 1/26/22, at 47-49; *see also* Permanency Review

---

[1] The parental rights of Child's mother, T.B. ("Mother"), and unknown father had previously been terminated pursuant to separate decrees dated and entered July 17, 2017. Following appeal, this Court affirmed the decree as to Mother. *In the Interest of L.B.*, 185 A.3d 1094 (Pa. Super. 2018) (unpublished memorandum). Neither Mother nor any unknown father participated in the instant appeals.

Order, 5/2/17. Despite the termination of Mother's parental rights in July 2017, the court denied the termination of Father's parental rights at that time. Order Denying Petition/Motion, 7/17/21. Child's goal remained return to parent or guardian and DHS pursued reunification with Father. Permanency Review Order, 7/17/17. In support thereof, the court ordered weekly supervised visitation between Father and Child and referred Father for parenting and other services. *Id.* Further, a Single Case Plan ("SCP") was established with respect to Father setting forth objectives, including: to comply with Community Umbrella Agency ("CUA") services; to provide pay stubs; to participate in Child's services;[2] and to participate in visitation. N.T., 1/26/22, at 9-10.

Thereafter, over the next four years, the court conducted regular review hearings where it maintained Child's commitment and placement, as well as permanency goal. While the court noted between full and substantial compliance between February 2018 and July 2018, over the following year, the court characterized Father's progress as moderate, minimal, and substantial. Permanency Review Orders, 7/12/19, 1/28/19, 10/29/18,

_____

[2] As described by the former CUA case manager, Sharise Streams, Child received numerous services, including occupational therapy, physical therapy, and speech and language therapy. N.T., 1/26/22, at 12. Ms. Streams explained that Child previously received many of these services through the Delaware County Intermediate Unit until he was enrolled in school, where they then transferred into his curriculum. *Id.* at 32-35. We observe that the record is devoid of information as to any specific diagnoses or conditions. However, there is no indication that these services were connected to or instituted in relation to Father as it is noted that Child was referred for early intervention services as early as May 18, 2016. Permanency Review Order, 5/18/16.

7/30/18, 4/30/18, and 2/2/18. By October 16, 2020, the court noted moderate compliance and minimal progress. Permanency Review Order, 10/16/20.

Notably, Father's visitation with Child progressed to unsupervised in 2018. Such visitation, however, was then suspended in December 2018 after an indicated report of abuse involving Father and Child. N.T., 1/26/22, at 15; *see also* Permanency Review Order, 1/28/19. Pursuant to the report of abuse, Father was the perpetrator and Child the victim resulting in a bruise on Child's forehead. *Id.*; *see also In the Interest of L.B.*, 229 A.3d 971 (Pa. Super. 2020) (unpublished memorandum at 2).[3]

Subsequent to reinstatement in 2019, Father's visitation remained supervised. N.T., 1/26/22, at 15-19; *see also* Permanency Review Orders, 2/11/21, 10/16/20, 3/4/20, 12/16/19, 10/9/19, and 7/12/19. Aside from visitation at the both the agency and the courthouse, Father also was offered therapeutic visitation "[b]ecause of [Child's] behavior, and not being -- not wanting to be in the same room with [Father]," whom he referred to as "'the man.'"[4] *Id.* at 16-19.

_____

[3] As a result, Child engaged in trauma therapy. *See* Permanency Review Orders, 7/12/19, 1/28/19; *see also In the Interest of L.B.*, 229 A.3d 971 (Pa. Super. 2020) (unpublished memorandum at 2); *see also* N.T., 1/26/22, at 12, 32-35. He thereafter participated in individualized and group therapy. *Id.* at 12. While unclear from the record, it is believed these are related.

[4] Ms. Streams testified that Father's therapeutic visitation through an initial provider, PCIT, which was "more interactive therapy," was "completed and
*(Footnote Continued Next Page)*

Ms. Streams, who supervised visitation occurring at the agency for a period of approximately two years between 2019 and 2021, described the visits as "awkward" and noted regression. *Id.* at 19-23. She labeled virtual visits during COVID-19 as "difficult," noting that Child "just would run around, the situation would become dangerous, he would fall down the steps, he would hide under tables. . . ." *Id.* at 20. She indicated that visitation further devolved after returning to in-person after the COVID-19 pandemic, recounting the removal of seatbelts and attempts to open the car door while moving. *Id.* at 22-24. Visitation was then ultimately suspended again in the summer of 2021, after a problematic visit on July 12, 2021, discussed *infra*. *Id.* at 16, 26-27; *see also* Permanency Review Order, 8/10/21; *see also* Order, 9/17/21. No visits occurred after this date. *Id.* at 16, 26-27.

On October 12, 2021, DHS filed petitions for the termination of parental rights and goal change. The court held a combined termination/goal change hearing on January 26, 2022. Father was present and represented by counsel but did not testify. DHS presented the testimony of CUA, Turning Points for Children, former case manager, Shanise Streams, and current case manager,

_____

Father declined further services." *Id.* at 18. Ensuing therapeutic visits through Assessment & Treatment Alternatives, Inc. ("ATA"), which were "more therapeutic," ended at the recommendation of the provider. *Id.* at 18-19. ATA summary dated March 2, 2020, stated, "[I]t does not appear that father and son require this level of supervision of visits for safety." Exhibit F-2, 3/4/20; *see also* Exhibit F-1.

Gabriella Roldan.[5]  Child, who was seven years old at the time of the hearing, was represented by legal counsel (also referred to as a "child advocate") as well as a guardian *ad litem* ("GAL").[6]

At the conclusion of the hearing, the court announced its decision to terminate Father's parental rights and change Child's permanency goal to adoption.  *Id.* at 62-63.  By separate decree and order dated and entered January 26, 2022, the court memorialized these determinations.  Thereafter, on February 16, 2022, Father, through appointed counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  This Court *sua sponte* consolidated Father's appeals on March 1, 2022.[7]

On appeal, Father raises the following issues for our review:

> 1. Did the [DHS] sustain the burden that Father's rights should be terminated when there was evidence that Father had completed and/or had been actively completing her [sic] permanency goals?
>
> 2. Was there was [sic] sufficient evidence presented to establish that it was in the best interest of the child to terminate Father's parental rights?

---

[5] DHS additionally presented DHS Exhibit 1 as to service on Father.  Father did not object to service.  N.T., 1/26/22, at 5-6.

[6] Both legal counsel and the GAL argued in favor of termination of Father's parental rights and a goal change.  *Id.* at 52-54.  Legal counsel additionally filed a brief with this Court in support thereof.

[7] On March 4, 2022, the trial court filed a Notice of Compliance with Rule of Appellate Procedure 1925(a), in which it references its reasoning placed on the record.

Father's Brief at 4 (unpaginated) (suggested answers omitted).[8]

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act. If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence,

---

[8] While Father filed a notice of appeal regarding the goal change order, we find that he has waived such a challenge for failing to raise this issue in the statement of questions involved portion of his brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived).

then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004). Here, we analyze the court's termination decrees pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by

the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (*quoting In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (internal citation omitted)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (*quoting In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011)). As such, "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or

disingenuous." ***In re S.C.***, ***supra*** at 1105 (*quoting* ***In re Z.P.***, 994 A.2d at 1118).

Instantly, in finding grounds for termination of Father's parental rights pursuant to Section 2511(a), including subsection (a)(2), the trial court noted that the former CUA case manager, Shanise Streams,[9] indicated that Father was "not always cooperative" and was "resistant" with respect to some of his SCP objectives. N.T., 1/26/22, at 57-58. The court recognized Father's "problematic" visitation history, recounting their suspension and supervision. ***Id.*** at 58. Further, the court stated, "[T]he record reflects that the compliance has over time, despite the efforts of CUA[,] has only been moderate and there has been no progress to alleviate the need for placement." ***Id.*** at 64.

Upon review, the record supports the trial court's finding of grounds for termination pursuant to Section 2511(a)(2). As to Father's compliance and progress, Ms. Streams, testified on direct examination:

> [**Q**]: And in terms of your time as case manager, how would you rate Father's compliance with his [SCP] objectives; on a scale of none, minimal, moderate, substantial, or full?
>
> [**A**]: I would say that [Father] was moderately compliant.
>
> [**Q**]: And his progress towards alleviating the reasons while [Child] was in his care, how would you rate that on the same scale?
>
> [**A**]: I don't feel that there was any progress because [Child] was actually digressing [sic].

---

[9] Ms. Streams stated that she was involved with this matter from approximately December 2018 to September 2021. N.T., 1/26/22, at 7, 28.

*Id.* at 27-28. Ms. Streams further stated that Father was "resistant" and "not always cooperative" with CUA. *Id.* at 10-11. Much of this related to the provision of pay stubs and proof of employment, and the signing of documents. *Id.* at 11.

Additionally, as noted *supra*, Child was engaged in various services. N.T., 1/26/22, at 12. While acknowledging nominal participation,[10] Ms. Streams indicated that Father did not attend any therapeutic services for Child. *Id.* at 13. She further noted that she provided information, but Father "never asked precisely" for any updates. *Id.* at 14. As such, Ms. Streams confirmed that Father failed to have "a complete understanding of [Child's] behavioral and emotional needs." *Id.* at 32.

Moreover, and importantly, although Father's visitation at one time in 2018 became unsupervised, it was suspended on two occasions thereafter, and remained supervised until the last visit on July 12, 2021, and subsequent second and final suspension. *Id.* at 14-16, 26-27; *see also* Order, 9/17/21; *see also* Permanency Review Orders, 8/10/21, 1/28/19. Father's visitation was suspended by the agency after an indicated report of abuse in December 2018, which the court maintained, pending therapeutic recommendation, on January 28, 2019. *Id.* at 15; *see also* Permanency Review Order, 1/28/19. *Id.* Pursuant to the report, Father was the perpetrator and Child the victim.

_____

[10] Ms. Streams conceded that Father attended an IEP meeting and was late in participating in a Zoom meeting relative to occupational therapy and speech therapy. *Id.* at 13.

- 11 -

Ms. Streams explained, Child "had a mark on his forehead, according to the report, and it was indicated that the mark was caused by [Father]."[11] *Id.* Father appealed the court's order and a panel of this Court vacated and remanded.[12] *In the Interest of L.B.*, 229 A.3d 971 (Pa. Super. 2020) (unpublished memorandum).

Subsequent to reinstatement in 2019, Father's visitation remained supervised, including through the provision of therapeutic visitation. N.T., 1/26/22, at 15-22. Over the course of the next two years of continued supervised visitation, Ms. Streams, who supervised the agency visitation, noted regression. *Id.* at 19-23. She described virtual visits during COVID-19 as "difficult" and "dangerous," again stating that Child "just would run around, the situation would become dangerous, he would fall down the steps, he would hide under tables. . . ." *Id.* at 20. Ms. Streams indicated that visitation further devolved after returning to in-person after the COVID-19 pandemic, recounting Child's removal of seatbelts and attempts to open the car door while moving. *Id.* at 22-24.

_____

[11] This mark was described as a bruise. *In the Interest of L.B.*, 229 A.3d 971 (Pa. Super. 2020) (unpublished memorandum at 2).

[12] This Court agreed with Father that the trial court erred in "outsourcing the decision of when . . . visits may or may not resume to a therapist, rather than to itself as the ultimate arbiter of whether Father poses a grave threat to Child or if other less restrictive measures are available rather than suspending visits altogether." *In the Interest of L.B.*, 229 A.3d 971 (Pa. Super. 2020) (unpublished memorandum at 10). The panel therefore vacated and remanded for the trial court to make a determination whether Father poses a grave threat to Child. *Id.*

Then, on July 12, 2021, Father retrieved Child from the lobby after several failed attempts of trying to get Child to go to the visitation room by Ms. Streams. Father held Child, who was screaming and crying, between his leg as he sat on the couch in the visitation room. After Ms. Streams' supervisor had to instruct Father to release Child, Child "ran out of the visitation room, ran down the hall and tried to run out of the building," before Ms. Streams was able to shepherd him into another room to calm down. *Id.* at 25-26. No visits took place after this date and Father's visitation was ultimately suspended. *Id.* at 16, 26-27; *see also* Permanency Review Order, 8/10/21; *see also* Order, 9/17/21.

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id*. Critically, Father's visitation was suspended following an indicated report of abuse and then remained supervised. His visitation was then suspended for a second time and remained suspended. Further, Father failed to participate in Child's services and, therefore, lacked an appreciation of Child's behavioral and emotional needs. *Id.* at 32. As we discern no abuse of discretion, we do not disturb the trial court's findings.

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Nevertheless, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we

have an obligation to see to their healthy development quickly. When courts

fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d at 1219 (*quoting **In re N.A.M.***, 33 A.3d

95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Instantly, in determining that termination would serve Child's needs and

welfare pursuant to Section (b), the trial court recounted Father's tortured

history with visitation and the "awkward" relationship between Father and

Child. N.T., 1/26/22, at 58-60. Moreover, not only did the relationship

"decline," it became "dangerous." ***Id.*** at 60. As such, the court determined

that there was no parent-child bond. ***Id.*** at 61. In continuing with its

reasoning, the court stated:

> Having observed and heard the testimony[,] and when I say observed, having observed [Father] and [Child,] I would submit that my observation shows that there's clearly no bond, in fact the opposite.
>
> [Child] has demonstrated establishing a relationship has just not come to pass. In addition to trying to exit a moving car, or throwing himself down the stairs and running away, in court I was able to observe each time Father would ask for a hug or sought a hug with the [c]ourt's observation that [Child] would

- 15 -

submit when he was asked, but he never independently volunteered hugs.

The child has been in foster care for years, well beyond the statutory time frame. Counsel for Father has asked for more time.

It's our -- it's this court's opinion that that would not be appropriate and in his best interest.

This child has been -- is in a pre-adoptive home with his siblings, treatment level pre-adoptive home with his siblings, and this is the home and the family that [Child] has known most of his life.

. . .

While there has been some positive interaction[,] as testified to, most interactions were negative.

The foster parent is meeting his needs and I think it's in his best interests to be adopted.

*Id.* at 61-63.

Upon review, the record reveals a lack of a parent-child bond between Father and Child in the approximate four and half years of Father's involvement, despite assistance provided to Father.[13] *Id.* at 27, 29-30. The former CUA case manager, Shanise Streams, described the relationship as "very awkward" and "wasn't like a father/child bond." *Id.* at 21. She stated, "It was like [Child] knew that he had to come to the visit[,] but he would come for what he would say is the pizza because he knew that [Father] would bring him pizza to the visits[,] or any kind of snacks that he wanted, and he would

---

[13] In response to inquiry from the court, Ms. Streams acknowledged, "There were some positive points but there were, to me, more negative points than positive points." *Id.* at 42.

- 16 -

play for some parts of the visit, not all the time." She further testified on direct examination:

> [**Q**]: And in your assessment did Father -- is there a caregiver/child bond between [Child] and [Father]?
>
> [**A**]: No.
>
> [**Q**]: Is there any improvement in the bond that you saw during your time as case manager between [Father] and [Child]?
>
> [**A**]: No.

*Id.* at 27. As such, Ms. Streams opined that there would be no irreparable harm if Father's parental rights were terminated and expressed concerns regarding a continued relationship between Father and Child. *Id.* at 29-20. Ms. Streams stated, "I do have a concern because of [Child's] behavior when it's time to see [Father]. [Child] can be very unpredictable and sometimes dangerous." *Id.* at 30.

Specifically, we reiterate, while Father's visitations at one time in 2018 became unsupervised, they were suspended on two occasions thereafter. *Id.* at 14-16; *see also* Permanency Review Orders, 8/10/21, 1/28/19; *see also* Order, 9/17/21. Upon reinstatement of Father's visitation in 2019, Father's visitation remained supervised. *Id.* at 15; *see also* Permanency Review Orders, 8/10/21, 2/11/21, 10/16/20, 3/4/20, 12/16/19, 10/9/19, and 7/12/19; *see also* Order, 9/17/21. Ms. Streams, who supervised visitation at the agency for a period of approximately two years between 2019 and 2021, described the visits as "awkward" and noted their devolution. *Id.* at 19-23. Ms. Streams testified:

So the visits were always awkward during my entire span on supervising the visits, but at the end I'd say probably within the last, after Covid and we were back to in-person visits, it just got worse. [Child] even refused to get in the car. It became dangerous to drive him because he would try to take off his seatbelt. He would try to open the door while the resource parent was on the expressway. And during that time[,] he would just be screaming to the top of his lungs. I do not want to go to these visits and that's when we would sometimes have to make the call to suspend the visits -- I meant [sic], not suspend, well, tell them that the visit can't happen that day and we can try again.

I would try to encourage him to come out beyond the phone. I would go to the house, trying to get him to come to the visits, and it just wasn't working.

*Id.* at 22-23. She further explained:

[Child] would be very standoffish almost every visit in the beginning of visits. He wouldn't talk sometimes for 15 minutes or so. I would time it to see how long it would take for him to begin to open up or have a conversation and this was every week.

He would get there. He would sit down. [Father] would try to ask him questions, like how was your day, how was school? Sometimes [Child] would answer, other times he would not.

He would sit there and eat the snacks that he was given a few times. He asked to leave the visits.

*Id.* at 23-24.

Then, on July 12, 2021, as illustrated *supra*, Father attempted to retain Child after several failed attempts to get Child to go to the visitation room. Child ultimately "ran out of the visitation room, ran down the hall and tried to run out of the building," before being guided into another room. *Id.* at 25-26. No visits took place after this date and Father's visitation was suspended for a second time. *Id.* at 16, 26-27; *see also* Permanency Review Order, 8/10/21; *see also* Order, 9/17/21.

- 18 -

Further, given Father's lack of participation and engagement in Child's services discussed **supra**, as noted, Ms. Streams confirmed that Father failed to have "a complete understanding of [Child's] behavioral and emotional needs." N.T., 1/26/22, at 32.

Moreover, Child, who was seven years old at the time of the hearing, had been in care for 74 months and in his pre-adoptive treatment foster care home with his two younger brothers since he was 14 months old. *Id.* at 28, 42-44. In indicating that it would be in Child's best interests to be freed for adoption, the current CUA case manager, Gabriella Roldan, stated, "[Child] has been in this home since he was 14 months old and he appears to be bonded with the resource parents and he provides for all of his needs and makes sure he goes to therapies." *Id.* at 44. Further, and significantly, Ms. Streams confirmed that Child wants to be adopted by his foster parents. *Id.* at 36.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or

her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Accordingly, based on the foregoing, we affirm the decree terminating Father's parental rights and the order changing the permanency goal to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2022